## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Between at least in or around November 2018 and on or about August 22, 2019, in the District of Maryland and elsewhere, the Defendant, **JASON JAVODARARID PASSPORT** ("**PASSPORT**"), and **Edward Jonathan Rivas** ("**Rivas**"), knowingly combined, conspired, confederated, and agreed with each other and others, known and unknown, to distribute and possess with the intent to distribute a mixture and substance containing cocaine base and a mixture and substance containing a detectable amount of cocaine, both Schedule II controlled substances, in violation of 21 U.S.C. § 841(a)(1).

On November 20, 2018, **PASSPORT** sold 55.89 grams of cocaine to an undercover officer in a parking lot near the Arundel Mills Mall in Hanover, Maryland. During this meeting, **PASSPORT** instructed the undercover officer to use coded language when ordering cocaine over the phone from **PASSPORT** in the future. For instance, **PASSPORT** instructed the undercover officer that "one case of apples" is code for one ounce of cocaine. The undercover officer handed **PASSPORT** $3,000 and **PASSPORT** provided the undercover officer with approximately two ounces of cocaine.

On February 21, 2019, **PASSPORT** sold 55.98 grams of cocaine to an undercover officer in the parking lot of a shopping center located in Silver Spring, Maryland. **Rivas** supplied the cocaine for this transaction to **PASSPORT**. In preparation for the drug transaction, per **PASSPORT's** instructions, the undercover officer ordered "two cases of apples," or two ounces of cocaine, by phone from **PASSPORT**. When **PASSPORT** and the undercover officer met to complete the cocaine sale, **PASSPORT** told the undercover officer that **PASSPORT's** narcotics source of supply, subsequently identified as **Rivas**, was on the way but was slow moving because he was disabled from the waist down. While they waited for **Rivas**, **PASSPORT** told the undercover officer that a kilogram of cocaine would cost between $36,000 and $39,000 and a quarter kilogram of cocaine would cost $13,500. **PASSPORT** also told the undercover officer about using Aspirin or Inositol as cutting agents to mix with the cocaine to maximize profits. While in the presence of the undercover officer, **PASSPORT** received a call from another narcotics customer ("Customer 1") and instructed Customer 1 to meet **PASSPORT** at the same shopping center. Moments later, Customer 1 arrived at the same parking lot, and waited with **PASSPORT** and the undercover officer for **Rivas** to arrive.

Approximately 30 minutes later, **PASSPORT** advised the undercover officer and Customer 1 that **PASSPORT's** narcotics source of supply (**Rivas**) had arrived. The undercover officer provided **PASSPORT** with $3,000 and Customer 1 also provided **PASSPORT** with a sum of U.S. currency. **PASSPORT** took the money from both individuals and went to go meet with **Rivas**. When **PASSPORT** returned, **PASSPORT** provided approximately two ounces of cocaine to the

undercover officer and approximately two ounces of cocaine to Customer 1. **PASSPORT** also kept an amount of cocaine for himself. During this transaction, **Rivas** sold **PASSPORT** approximately 4.5 ounces (approximately 127 grams) of cocaine in total. **Passport** sold approximately an equivalent amount of cocaine to Customer 1. **PASSPORT**, in turn, distributed or possessed with intent to distribute approximately 127 grams of cocaine.

On May 22, 2019, the undercover officer purchased 27.86 grams of cocaine and 27.71 grams of cocaine base from **PASSPORT**. Just prior to the May 22, 2019 transaction, **Rivas** supplied the narcotics to **PASSPORT** for this transaction. This transaction took place near a Vietnamese restaurant in Wheaton, Maryland. During their meeting, **PASSPORT** told the undercover officer that **PASSPORT** had obtained the narcotics from his source of supply (**Rivas**) the day before their meeting. Phone records and a court-authorized GPS tracking warrant on **Rivas's** vehicle confirmed that **Rivas** and **PASSPORT** had met briefly the night before the drug transaction in Silver Spring, Maryland. On May 22, 2019, the undercover officer handed **PASSPORT** $3,000 in U.S. currency and **PASSPORT** provided the undercover officer with approximately 27.86 grams of cocaine and 27.71 grams of cocaine base.

On July 24, 2019, the undercover officer purchased approximately 20.76 grams of cocaine and 34.48 grams of cocaine base from **PASSPORT** at a parking lot in Silver Spring, Maryland. Once again, just prior to the transaction, **Rivas** supplied **PASSPORT** with the narcotics that **PASSPORT** sold to the undercover officer. Leading up to their narcotics transaction, the undercover officer sent **PASSPORT** a text message confirming the location of their upcoming meeting. **PASSPORT** responded that **PASSPORT's** source of supply (**Rivas**) had not yet delivered the drugs, but was going to do so that day before their meeting. Just prior to **PASSPORT**'s meeting with the undercover officer, law enforcement officers watched **Rivas** leave **Rivas's** residence in Bowie, Maryland, and drive to meet with **PASSPORT** and conduct a hand-to-hand narcotics transaction. After receiving the narcotics from **Rivas, PASSPORT** contacted the undercover officer and arranged to meet up, which they did. In exchange for $3,100, **PASSPORT** provided the undercover officer with approximately 20.76 grams of cocaine and 34.48 grams of cocaine base. **PASSPORT** also confirmed that **PASSPORT**'s narcotics supplier was the same supplier as their previous transaction.

On August 22, 2019, when law enforcement officers executed a search warrant at **PASSPORT's** house, officers recovered the following from **PASSPORT's** bedroom: a silver spoon containing suspected cocaine residue on a cabinet; two baggies containing a total of 33 foil-wrapped packages of cocaine next to two digital scales and $4,800 in U.S. currency (the "seized funds") in a drawer inside that same cabinet, a baggie containing cocaine residue in a trash can next to the bed, and a cell phone and an additional digital scale. **PASSPORT** was present in his bedroom at the time officers executed the search warrant. In total, officers recovered approximately 17.57 grams of cocaine and 2.45 grams of cocaine base during the execution of the search warrant as **PASSPORT's** residence.

The seized funds were proceeds obtained by **PASSPORT** as the result of his narcotics trafficking and/or were used, or intended to be used, to commit or facilitate the commission of **PASSPORT's** narcotics trafficking offenses or were substitute assets.

Rev. August 2018

In total, as part of this conspiracy, the amount of converted drug weight reasonably foreseeable to **PASSPORT**, based on his possession of at least 248 grams of cocaine and 64 grams of cocaine base, was at least 100 kilograms and less than 400 kilograms.

SO STIPULATED:

Eric B. Pulice
Rajeev R. Raghavan
Assistant United States Attorney

Jason Jayodararid Passport
Defendant

Julie Stelzig, Esq.
Counsel for Defendant